UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY,<br><br>                                     **Plaintiffs,**<br><br>        **-against-**<br><br>MAKSYM FESLER, GYSAKA SERVICES INC, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5,<br><br>                                     **Defendants.** | CIVIL ACTION<br><br>24-CV-1857<br><br>COMPLAINT<br><br>(TRIAL BY JURY DEMANDED) |

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company (hereinafter "**Plaintiffs**"), by their attorneys, Morrison Mahoney LLP, for their Complaint against Defendants Maksym Fesler ("Fesler"), Gysaka Services Inc ("Gysaka") (Fesler and Gysaka are collectively referred to as "**Retail Defendants**"), John Does 1 through 5, and ABC Corporations 1 through 5 (collectively "**Defendants**") allege as follows:

## PRELIMINARY STATEMENT

1.      From at least January 2020 and continuing through the date of the filing of this Complaint, Defendants engaged in a scheme to defraud automobile insurance companies, including Plaintiffs, through New York State's No-fault system.

2.      This action seeks to recover more than $96,000.00 that Defendants stole from Plaintiffs through the submission of thousands of false and/or fraudulent insurance claims for durable medical equipment ("DME") and/or orthotic devices.  As used herein, (i) "DME" generally refers to equipment and/or supplies used for medical purposes by individuals in their homes, including, among other things, cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, hot/cold packs, infrared heat lamps, lumbar cushions, mattresses;

and (ii) "orthotic devices" generally refers to items that are used to support a weak or deformed body member or to restrict or eliminate movement for medical purposes. Such items include, but are not limited to, back braces, cervical collars, knee braces, shoulder braces and wrist braces.

3.      At all relevant times mentioned herein, each and every DME and/or orthotic device supplied by Gysaka was provided pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as defined below.

4.      To execute the scheme to defraud alleged herein, Fesler, through Gysaka, entered into arrangements with, *inter alia*, one or more medical clinics operating in the New York metropolitan area that bills No-fault insurers for medical services (hereinafter "No-fault Clinics").

5.      Pursuant to these arrangements and in exchange for kickbacks and/or other financial compensation, the managers, owners and/or controllers of No-fault Clinics, which are not named as defendants in this action, facilitated the scheme in several ways, including but not limited to:

> (i) ensuring that their associated doctors and/or chiropractors (hereinafter "Health Care Practitioners" or "HCPs") prescribed large amounts of virtually identical DME and/or orthotic devices to their patient population, pursuant to a predetermined course of treatment irrespective of medical necessity, with the prescribed items being dictated by Gysaka;
>
> (ii) ensuring that the prescriptions were sufficiently generic so that the nature, quality, and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone; and/or
>
> (iii) ensuring that the prescriptions were provided directly to Gysaka to ensure that Gysaka could bill Plaintiffs to purportedly fill the prescription

rather than allow the possibility that the Covered Person may fill the prescription at a DME retailer of their own choosing.

6.      The use of generic descriptions in the fraudulent prescriptions enabled the Retail Defendants to: (i) misrepresent the nature and quality of the DME and/or orthotic devices prescribed to the patient, if any items were legitimately prescribed at all; (ii) misrepresent the nature and quality of the items that were dispensed to the patient, if any items were dispensed at all; and (iii) fraudulently bill for products that would result in the highest forms of reimbursement from insurers, in general, and Plaintiffs, in particular.

7.      Pursuant to the fraudulent prescriptions, Gysaka routinely provided (or purported to provide) a nearly identical battery of DME and/or orthotic devices to persons injured in automobile accidents insured by Plaintiffs (hereinafter "Covered Persons"), regardless of medical necessity, in order to maximize reimbursement from insurers in general, and Plaintiffs in particular.

8.      On information and belief, the Retail Defendants then paid kickbacks or other forms of compensation to the No-fault Clinics for the fraudulent prescriptions, which were transmitted directly by the Clinics to the Retail Defendants to support their claims for reimbursement.

9.      In many instances, Fesler submitted to Plaintiffs, through Gysaka, prescription forms which they knew to be intentionally generic, in order to misrepresent the number and/or quality of DME and/or orthotic devices actually prescribed by the No-fault Clinics' HCPs, if any were prescribed at all.

10.      In furtherance of the scheme to defraud alleged herein, Gysaka purchased the cheap DME and/or orthotic devices in bulk and routinely mispresented the nature, quality, and

cost of the items in order to fraudulently obtain and maximize its reimbursement far in excess of the amounts it was entitled to receive under the No-fault Law.

11.     After obtaining the fraudulent prescriptions from the No-fault Clinics, Fesler, through Gysaka, generated and submitted bills to Plaintiffs, among others, knowingly misrepresenting the actual amounts they paid for the DME and/or orthotic devices, as well as the nature and quality of the items, and the medical necessity of the purportedly prescribed DME and/or orthotics.

12.     In order to prevent Plaintiffs from determining the appropriate charges associated with any such DME and/or orthotic device, or whether the specific DME and/or orthotic device billed for was medically necessary, the documents submitted to Plaintiffs by Fesler through Gysaka, in support of their fraudulent claims, deliberately omitted and/or misrepresented basic information about the DME and/or orthotic devices, including, but not limited to, the manufacturer, make, model, size, features and/or functions of the item and/or included information that was meaningless in determining the kind and quality of any specific DME and/or orthotic device.

13.     At all relevant times mentioned herein, Fesler, through Gysaka, deliberately omitted any wholesale and/or acquisition invoices from their claim submissions to Plaintiffs in an effort to conceal the actual nature, quality, and purchase price of the items Gysaka purportedly supplied to patients.

14.     At all relevant times mentioned herein, in support of their claims for reimbursement, and to facilitate the fraud described herein, Fesler, through Gysaka, generated delivery receipts that included a space for the patient's signature to document receipt of each item for which Fesler, through Gysaka, billed Plaintiffs.

15.     On information and belief, often pursuant to the agreements between the Retail Defendants and the No-fault Clinics, patients were directed to sign these delivery receipts upon presenting to the No-fault Clinics, irrespective of whether any DME and/or orthotic devices were provided to the patient at that time. The Retail Defendants then submitted to Plaintiffs the signed delivery receipts as purported evidence of DME and/or orthotic devices allegedly supplied to a patient, when, in fact, no DME or orthotic device was ever supplied to the patient.

16.     In order to execute the scheme to defraud, at all relevant times mentioned herein, Fesler, through Gysaka, engaged in one or more of the following actions: (i) paying kickbacks or other financial compensation to No-fault Clinics in exchange for fraudulent prescriptions of DME and/or orthotic devices; (ii) obtaining prescriptions that were provided pursuant to a predetermined course of treatment as opposed to medical need; (iii) obtaining and submitting to insurers, in general, and Plaintiffs, in particular, prescriptions which they knew to be intentionally generic in order to misrepresent the number and/or quality of DME and/or orthotic devices actually prescribed; (iv) arranging for the No-fault Clinics to have assignments of benefits and acknowledgement of delivery of receipt forms pre-signed by Covered Persons to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiffs, in particular, and (v) systematically submitting bills to insurers, in general, and Plaintiffs, in particular, for DME and/or orthotic devices that Fesler, through Gysaka, determined should be prescribed by the No-fault Clinics, with virtually every Covered Person receiving substantially similar DME and/or orthotic devices.

17.     At all relevant times mentioned herein, each and every bill and supporting documentation submitted by Gysaka contained the same or similar false representations of material facts, including, but not limited to one or more of the following: (i) false and misleading

statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to Covered Persons; (ii) false and misleading statements as to the amounts Gysaka was entitled to be reimbursed under the No-fault Law; (iii) false and misleading statements that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the Covered Persons; (iv) false and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to Covered Persons, which generically described the item(s) in order to conceal the nature, type, and quality of item(s) being prescribed and/or provided; and (v) false and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the DME and/or orthotic devices either were not prescribed as alleged, or were prescribed and supplied pursuant to a pre-determined, fraudulent protocol, whereby Gysaka paid kickbacks to No-fault Clinics to induce the No-fault Clinics to provide fraudulent prescriptions for large amounts of substantially similar, medically unnecessary DME and/or orthotic devices.  All of foregoing was intended to manipulate the payment formulas under the No-fault Law in order to maximize the charges that Gysaka could submit to Plaintiffs and other insurers under the No-fault Law.

18.     In carrying out the scheme to defraud, Defendants stole in excess of $96,000.00 from Plaintiffs by submitting, causing to be submitted or facilitating the submission of fraudulent claims for persons who allegedly sustained injuries covered by the New York State Comprehensive Motor Vehicle Insurance Reparations Act, Ins. Law §§ 5101, *et seq*. (popularly known as the "No-fault Law").

## STATUTORY/REGULATORY SCHEME

19.     Pursuant to the No-fault Law, Plaintiffs are required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles or pedestrians, which arise from the use or operation of such motor

vehicles in the State of New York.  Covered Persons can also assign these benefits to doctors and other properly licensed healthcare providers, including DME retailers, enabling them to bill insurance companies directly for their services.

20.     As alleged herein, Defendants exploited and continue to exploit this system by obtaining such assignments and billing Plaintiffs for DME and/or orthotic devices that were never provided, not provided as billed or, if provided, were of inferior quality relative to what was represented to have been provided in the bills submitted to Plaintiffs, and/or were otherwise medically unnecessary and provided pursuant to fraudulent prescriptions in conformity with a predetermined course of treatment in which virtually all Covered Persons received substantially similar DME and/or orthotic devices.  Exhibit "1" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs to Gysaka for medical equipment and/or other services provided pursuant to fraudulent prescriptions based upon a predetermined course of treatment, irrespective of medical necessity.

21.     Gysaka is ostensibly a DME supply company that bills for medical supplies provided to, among others, individuals covered under the No-fault Law.  In exchange for its services, Gysaka accepted assignments of benefits from Covered Persons and submitted claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

22.     In accordance with the No-fault Law and 11 N.Y.C.R.R. §§ 65 *et seq*., Gysaka submitted its claims to Plaintiffs using the claim forms prescribed by the New York State Department of Financial Services ("DFS," f/k/a the Department of Insurance), including the "No-Fault Assignment of Benefits Form" or form "NF-AOB" and a bill in the form of the "Verification of Treatment by Attending Physician or Other Provider of Health Service" or

"NYS form NF-3" (hereinafter "NF-3"), or a substantially similar form (such as the "Health Insurance Claim Form" or "CMS Form 1500").

23.     At all relevant times mentioned herein, pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiffs by Gysaka contained the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for commercial insurance or statement of claim for any commercial or personal insurance benefits containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto…commits a fraudulent insurance act, which is a crime….

24.     At all relevant times mentioned herein, Gysaka identified the DME and/or orthotic devices it purported provided to Covered Persons on the claim forms using Healthcare Common Procedure Coding System (HCPCS) Level II Codes, a standardized coding system maintained by the Centers for Medicare & Medicaid Services (CMS) used to identify services not identified in the American Medical Association's Current Procedural Terminology (CPT) code set, including, *inter alia,* durable medical equipment and orthotic devices.

25.     At all relevant times mentioned herein, pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs was (and is) required to promptly process claims within 30 days of receipt of proof of claim.

26.     At all relevant times mentioned herein, Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a DME provider, may recover for health service-related expenses. Under this section, such persons are only entitled to reimbursement of necessary medically related expenses in accordance with the applicable fee schedules established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the DFS.

27.     By Opinion Letter dated June 16, 2004, entitled "No-Fault Fees for Durable Medical Equipment," the New York State Insurance Department recognized the harm inflicted on insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

28.     At all relevant times mentioned herein, pursuant to Ins. Law § 5108, the Superintendent of the DFS adopted, by promulgation of Regulation 83, the Workers' Compensation Board ("WCB") Fee Schedules for determining the maximum permissible reimbursement amounts for which health care providers may charge for services provided to Covered Persons under the No-fault Law. 11 N.Y.C.R.R. § 68.1.

29.     At all relevant times mentioned herein, Regulation 83 did not adopt the Workers' Compensation Fee Schedules with respect to "workers' compensation claim forms, pre-authorization approval, time limitations within which health services must be performed, enhanced reimbursement for providers of certain designated services..."

30.     Effective October 6, 2004, the Department of Financial Services, through the Superintendent's promulgation of the 28th Amendment to Regulation 83 (11 N.Y.C.R.R. § 68 *et. Seq*.), established a fee schedule for the reimbursement of durable medical equipment and medical supplies by adopting the New York State Medicaid fee schedules for durable medical equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances (hereinafter the "Fee Schedule"). The Fee Schedule was in effect at all dates of service mentioned herein.

31.     The 28th Amendment to Regulation 83 provided:

> [The] maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the New York State Medicaid program at the time such equipment and supplies are provided. If the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.

11 N.Y.C.R.R. § 68 (Appendix 17-C, Part F) (effective through July 10, 2007).

32.     Effective July 11, 2007, for DME and/or orthotic devices provided up to and including April 3, 2022, the WCB established a fee schedule for DME and orthotic devices by also adopting the New York State Medicaid fee schedule for durable medical equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances. 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2021).

33.     In view of the adoption by the WCB of the New York State Medicaid fee schedule, on or about April 16, 2008, the DFS promulgated the 30th Amendment to Regulation 83, which repealed Part F of Appendix 17-C, since it was no longer needed due to the DFS' prior adoption of the WCB's fee schedule, which then included the Fee Schedule that was, and is, in effect at all relevant times mentioned herein.

34.     Accordingly, at all relevant times mentioned herein, providers of DME are entitled to reimbursement in the amounts set forth in the Fee Schedule.  At all relevant times mentioned herein, with respect to items not listed on the Fee Schedule (hereinafter "Non-Fee Schedule" items), the provider is only entitled to reimbursement in an amount equal to the *lesser* of either: (i) the net acquisition cost of the medical equipment to the provider, plus 50%, or (ii)

the usual and customary price charged to the public (sometimes referred to herein as the "Lesser of Standard"). 11 N.Y.C.R.R. § 68.1; 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2021).

35.     By Board Bulletin Numbers 046-1408, dated May 24, 2021, and 046-1496, dated February 3, 2022, the Chair of the WCB delayed the implementation of amendments to 12 N.Y.C.R.R. §§ 442.2, 442.4 and 442.5, which was to become effective June 7, 2021, with the result that the Fee Schedule and the Lesser of Standard remained effective for Workers' Compensation and No-fault claims until the completion of Phase 2 of the WCB's implementation of its new electronic claims management system, OnBoard on April 4, 2022. New York Workers' Compensation Board Bulletin Nos. 046-1408 (May 24, 2021) (http://www.wcb.ny.gov/content/main/SubjectNos/sn046_1408.jsp), 046-1496 (Feb. 3, 2022) (http://www.wcb.ny.gov/content/main/SubjectNos/sn046_1496.jsp).

36.     At all relevant times mentioned herein, pursuant to Section 5108(c) of the No-fault Law, "no provider of health services . . . may demand or request any payment in addition to the charges authorized pursuant to this section."

37.     Moreover, to be eligible for reimbursement under the No-fault Law during all relevant times mentioned herein, all claims for reimbursement must include a description of the "full particulars of the nature and extent of the . . . treatment received," including DME. *See* 11 N.Y.C.R.R. § 65-1.1.

38.     At all relevant times mentioned herein, nearly each and every bill mailed to Plaintiffs by Fesler, through Gysaka, sought reimbursement in excess of the amounts authorized by the No-fault Law, by materially misrepresenting the DME and/or orthotic devices provided, if provided at all, as well as the cost, quality, and medical necessity of the billed-for DME and/or orthotic devices.  To the extent the DME and/or orthotic devices were provided at all, each item

was a basic, low-quality piece of medical equipment for which the proper reimbursement amount, if reimbursable at all, was a mere fraction of the amount they charged Plaintiffs, and/or was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

39.     At all times relevant herein, the Defendants exploited the No-fault Law through the utilization of various deceptive and identical billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular, through the submission of fraudulent billing documents that misrepresented the nature, quality and cost of items that both are and are not listed on the relevant fee schedule ("Fee Schedule items" and "Non-Fee Schedule items," respectively) purportedly provided to Covered Persons.

40.     As set forth in the "Non-Fee Schedule Scheme to Defraud" below, Fesler, through Gysaka, routinely submitted bills to Plaintiffs for Non-Fee Schedule items wherein Gysaka misrepresented that (i) the DME and/or orthotic devices purportedly provided were reimbursable under the relevant Fee Schedule in existence at the time, when, in fact, Gysaka was utilizing codes that were not recognized by, or otherwise listed in, the relevant Fee Schedule ("phantom codes"); (ii) the charges reflected on Gysaka's bills were in accordance with 12 N.Y.C.R.R. § 442.2, when, in fact, the charges were grossly inflated; and/or (iii) the DME and/or orthotic devices purportedly provided were reimbursable pursuant to the Fee Schedule, when they were not.  In doing so, Fesler, as described in the "Non-Fee Schedule Scheme to Defraud" section below, through Gysaka, deliberately misrepresented the amounts that they were entitled to receive under the No-fault Law.

41.     In addition, as set forth in the "Fee Schedule Scheme to Defraud" section below, Fesler, through Gysaka, also routinely submitted fraudulent bills to Plaintiffs for (i) expensive

custom-fabricated DME and/or orthotic devices, such as shoulder braces that were never provided; (ii) expensive DME and/or orthotic devices that required a customized fitting that they never performed; and/or (iii) reimbursement under expensive fee schedule codes for DME and/or orthotic devices that Gysaka never actually provided.

42.     On information and belief, every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, who, to the extent that they provided any DME and/or orthotic devices at all, provided Covered Persons with inferior, low-quality items, or items that directly contravened the treatment plan indicated by the treating physicians, potentially compromising patients' health.

43.     The duration, scope and nature of the Defendants' illegal conduct bring this case well within the realm of criminal conduct to which the Racketeer Influenced and Corrupt Organizations Act ("RICO") applies. Defendants did not engage in sporadic acts of fraud – although that would be troubling enough – rather, they adopted a business plan and used it to participate in systematic patterns of racketeering activity.  Every facet of Defendants' operations, from securing fraudulent prescriptions for DME and/or orthotic devices pursuant to a predetermined course of treatment, to obtaining inexpensive, low quality items, to generating bills that contained codes not recognized under the Fee Schedule in existence at the time, or that misrepresented the nature, quality, and cost of DME and/or orthotic devices purportedly provided, was carried out for the purpose of committing fraud.

44.     This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to legitimate insurance claims for DME and/or orthotic devices.  In doing so, Plaintiffs seek compensatory damages and declaratory relief that Plaintiffs

are not required to pay any of the Retail Defendants' No-fault claims because Fesler, through Gysaka, submitted (1) false and fraudulent insurance claims to Plaintiffs deliberately misrepresenting the amounts they were entitled to be reimbursed; (2) false and fraudulent insurance claims to Plaintiffs for DME and/or orthotic devices the Retail Defendants never actually supplied to Covered Persons; and/or (3) false and fraudulent insurance claims to Plaintiffs for DME that, to the extent anything was provided at all, was provided pursuant to a predetermined protocol of treatment without regard to medical necessity. Such claims continue to be submitted by and/or in the name of Gysaka and are, or can be, the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus, constitute a continuing harm to Plaintiffs.

45.     By way of example and not limitation, Exhibit "2" in the accompanying Compendium of Exhibits is a spreadsheet listing in excess of $134,000.00 in unpaid No-fault claims that form the basis of Plaintiffs' request for declaratory relief. Said spreadsheet is grouped by claim number, date of service and the amount billed.

<u>**NATURE OF THE ACTION**</u>

46.     This action is brought pursuant to:

    i)    The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. §§ 1961, 1962(c) and 1964(c);

    ii)    New York State common law; and

    iii)    the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

<u>**NATURE OF RELIEF SOUGHT**</u>

47.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs seek treble damages, which they sustained as a result of the Defendants' schemes to defraud and acts of mail fraud in connection with their use of the facilities of the No-fault system to fraudulently obtain payments from

Plaintiffs for DME and/or orthotic devices they allegedly provided to individuals covered by Plaintiffs under New York State's No-fault Law.

48.     Plaintiffs further seek a judgment declaring that they are under no obligation to pay any of Gysaka's unpaid No-fault claims because:

i)     The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible amount they could submit to Plaintiffs;

ii)    The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME and/or orthotic devices that they never supplied to Covered Persons; and

iii)   The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME that, to the extent anything was provided at all, was provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

49.     As a result of Defendants' actions alleged herein, Plaintiffs were defrauded of an amount in excess of $96,000.00, the exact amount to be determined at trial, in payments which Defendants received for fraudulently billing Plaintiffs for DME and/or orthotic devices that were never provided or, if provided, not provided as billed and/or provided pursuant to fraudulent prescriptions in accordance with a predetermined course of treatment, irrespective of medical need.

## **THE PARTIES**

**A.    Plaintiffs**

50.     Plaintiff Allstate Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

51.     Plaintiff Allstate Fire and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

52.     Plaintiff Allstate Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

53.     Plaintiff Allstate Property and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

54.     Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company are collectively referred to herein as "Plaintiffs."

55.     Plaintiffs are duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York and provide automobile insurance coverage to their policyholders under and in accordance with New York State law.

**B.    <u>Retail Defendants</u>**

56.     Maksym Fesler ("Fesler") is a natural person residing in the State of New York, is the principal, officer, and/or director of Gysaka and, at all times relevant herein, operated, managed, and/or controlled its activities.

57.     Gysaka Services Inc ("Gysaka") was incorporated on January 2, 2020, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 1527 Franklin Avenue, Ste. 206, Garden City, NY 11501.  Gysaka is operated, managed, and/or controlled by Defendant Fesler and

submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

**C.**   **The John Doe Defendants**

58.   On information and belief, John Does 1 through 5 are individuals that are unknown to Plaintiffs, who conspired, participated, conducted, and assisted in the fraudulent and unlawful conduct alleged herein. These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

**D.**   **The ABC Corporations**

59.   On information and belief, the ABC Corporations 1 through 5 are additional companies that are unknown to Plaintiffs that are owned, controlled, and operated by one or more of the John Doe Defendants, which were used in connection with the kickback scheme with the Defendants alleged herein to obtain referrals, prescriptions and/or patients in furtherance of the scheme. These ABC Corporations 1 through 5 will be added as defendants when their names and the full extent of their participation become known through discovery.

**JURISDICTION AND VENUE**

60.   Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. because they arise under the laws of the United States.

61.   This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

62.   This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

63.     Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

64.     Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Eastern District of New York is the district where one or more the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL BACKGROUND AND ALLEGATIONS
## APPLICABLE TO ALL CAUSES OF ACTION

65.     Plaintiffs underwrite automobile insurance in New York State and participate as insurers in New York State's No-fault program.

66.     As set forth in the Statutory/Regulatory Scheme section above, pursuant to the No-fault Law, Plaintiffs are required to pay for, *inter alia*, health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians that arise from the use or operation of such motor vehicles in the State of New York.

67.     Gysaka is ostensibly a DME supply company that bills for medical supplies provided to, among others, individuals covered under the No-fault Law.  In exchange for its services, Gysaka accepts assignments of benefits from Covered Persons covered under the No-Fault Law and submits claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

68.     To process and verify the claims submitted by Gysaka, Plaintiffs required, and Gysaka submitted, prescriptions and other documents relating to the DME and/or orthotic devices allegedly supplied to Covered Persons for which Gysaka was seeking reimbursement from Plaintiffs.

69.     In nearly all instances, the prescriptions submitted in support of Gysaka's claims for reimbursement were fraudulent, intentionally generic, and/or issued pursuant to a pre-determined treatment protocol, regardless of medical necessity.

70.     At all relevant times mentioned herein, in each bill submission to No-fault insurers in general, and Plaintiffs in particular, Gysaka made the following representations to each recipient:

- The bill for DME and/or orthotic devices was based on a valid prescription by a healthcare practitioner licensed to issue such prescriptions;

- The prescription for DME and/or orthotic device(s) was not issued pursuant to any unlawful financial arrangements;

- The DME and/or orthotic device(s) identified on the bill was actually provided to the Covered person based on a valid prescription identifying medically necessary items;

- The billing code used on the bill actually represents the DME and/or orthotic device(s) and all included services that was provided to the Covered Person; and

- The fee sought for the billed for DME and/or orthotic device(s) did not exceed that permissible under the No-fault law and regulations.

71.     Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are required to promptly process Gysaka's claims within 30 days of receipt of proof of claim.

72.     To fulfill its obligation to promptly process claims, Plaintiffs justifiably relied upon the bills and documentation submitted by Gysaka in support of its claims, and paid Gysaka based on the representations and information contained in the bills and documentation that Defendants mailed to Plaintiffs.

73.     At all relevant times mentioned herein, the No-fault Law provides that the maximum permissible charge for the purchase of durable medical equipment, medical/surgical

supplies and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the relevant fee schedule established by the Worker's Compensation Board, as adopted by the Superintendent of the DFS. N.Y. Ins. Law § 5108; 11 N.Y.C.R.R. 68.1(a).

74.     At all relevant times mentioned herein, for DME and orthotic devices, the Worker's Compensation Board has adopted the fee schedule set by the New York State Medicaid program at the time such equipment and supplies are provided. 12 N.Y.C.R.R. § 442.2 (effective through June 7, 2021).

75.     At all relevant times mentioned herein, with respect to DME and/or medical supplies for which the New York State Medicaid program has not established a fee ("Non-Fee Schedule Items"), the regulation provides that the fee payable shall be the lesser of:

> (1)     the acquisition cost (*i.e.*, the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent; or
>
> (2)     the usual and customary price charged to the general public.

12 N.Y.C.R.R § 442.2 (effective through June 7, 2021).

76.     At all relevant times mentioned herein, as a result of the WCB's delay of implementation of amendments to 12 N.Y.C.R.R. § 442.2, intended to become effective June 7, 2021, the fee schedule set by the New York State Medicaid Program and adopted by the WCB, and the Lesser of Standard continued to set the maximum permissible charge for DME and/or orthotic devices dispensed through April 3, 2022. New York Workers' Compensation Board Bulletin Nos. 046-1408 (May 24, 2021), 046-1496 (Feb. 3, 2022).

77.     Gysaka was created as the centerpiece of an elaborate scheme to fraudulently bill No-fault insurance carriers for DME and/or orthotic devices that were never provided, were not provided as billed or, if provided, were either of inferior quality relative to what was included in

the bills submitted to Plaintiffs, and/or were otherwise medically unnecessary and provided pursuant to a predetermined course of treatment in which virtually all Covered Persons received the same or similar battery of DME and/or orthotic devices.

78.     The DME and/or orthotic devices that Gysaka purported to provide, and for which they billed Plaintiffs, seldom varied from patient-to-patient over a given period of time and also did not change based on any differences in the patients' condition, age, complaints, type of accident, or nature of alleged injury.   Instead, Fesler, through Gysaka, created a billing apparatus implementing a pre-determined treatment protocol that was designed to drain the maximum amount of dollars from insurance companies for each and every patient, including those who required little or no DME at all.

79.     Fesler created and controlled Gysaka, as part of a well-organized illegal enterprise that engaged in systematic and pervasive fraudulent practices that distinguished it from legitimate providers of DME and/or orthotic devices.   The components of this enterprise followed practices that were part of a racketeering scheme dictated by Fesler, including, but not limited to, the one of more of the following practices:

- Unlike legitimate retail DME companies, Fesler, through Gysaka, misrepresented the nature, quality, and cost of DME and/or orthotic devices purportedly provided to Covered Persons;

- Unlike legitimate retail DME companies, Fesler, through Gysaka, submitted bills to Plaintiffs misrepresenting the amounts they were entitled to be reimbursed under the No-fault Law;

- Unlike legitimate retail DME companies, Fesler, through Gysaka, submitted bills to Plaintiffs for DME and/or orthotic devices that were never provided to Covered Persons;

- Unlike legitimate retail DME companies, Fesler, through Gysaka, misrepresented the acquisition costs and/or usual and customary price of the Non-fee Schedule items purportedly supplied to Covered Persons;

- Unlike legitimate retail DME companies, Fesler, through Gysaka, submitted bills to Plaintiffs reflecting prices far in excess of those actually

paid, concealing that the items actually supplied were far less expensive than the amounts indicated in the bills for any particular item;

- Unlike legitimate retail DME companies, Fesler, through Gysaka, submitted prescriptions, bills, and delivery receipts to Plaintiffs for DME and/or orthotic devices that generically described the item(s) so as to conceal the type of item(s) being prescribed and/or provided;

- Unlike legitimate retail DME companies, Fesler, through Gysaka, concealed the fact that the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol pursuant to a kickback or other financial arrangement with No-fault Clinics;

- Unlike legitimate retail DME companies, Fesler, through Gysaka and/or those acting under their direction and control, had agreements and/or understandings as to what generic DME and/or orthotic devices would be prescribed by the No-fault Clinics;

- Unlike legitimate retail DME companies, Fesler, through Gysaka, arranged for the generic language on the prescription forms in order to unilaterally determine the DME and/or orthotic devices to be provided to patients and billed to insurers, in general, and Plaintiffs in particular;

- Unlike legitimate retail DME companies, Fesler, through Gysaka, arranged to have prescriptions for DME and/or orthotic devices delivered to them directly by the No-fault Clinics, rather than allowing the patients to select their own DME supply company; and/or

- Unlike legitimate retail DME companies, Gysaka claimed to conduct their daily operations from locations that in some cases had no signage, were shuttered, and or presented no indication that any business was conducted at that location.

80.     In these and numerous other ways, Defendants sought to deceive Plaintiffs into paying fraudulent claims that typically exceeded thousands of dollars per Covered Person.

81.     The members of the Gysaka enterprise alleged herein played well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs of the enterprises.  By way of example and not limitation, in furtherance of their scheme to defraud, Fesler engaged in one or more the following:

- Entered into kickback or other financial arrangements with No-fault Clinics, not named as defendants in this action, to ensure that their HCPs prescribed large amounts of virtually identical DME and/or orthotic devices to their patient population;

- Entered into kickback or other financial arrangements with No-fault Clinics to ensure that the prescriptions provided were sufficiently generic so that the nature, quality, and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone;

- Entered into kickback or other financial arrangements with No-fault Clinics to ensure that the prescriptions provided were sufficiently generic so that Gysaka could unilaterally determine the DME and/or orthotic devices to be provided to patients and billed to insurers, in general, and Plaintiffs in particular;

- Submitted or caused to be submitted, on behalf of Gysaka, numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to many Covered Persons;

- Prepared or caused to be prepared fraudulent bills to be mailed to Plaintiffs; and/or

- Mailed or caused those acting under their direction to mail bogus claims to Plaintiffs, knowing that they contained materially false and misleading information.

82.     At all relevant times mentioned herein, Fesler knew that the prescriptions provided by the No-fault Clinics were fraudulent in that they were issued pursuant to a fraudulent treatment protocol at the No-fault Clinic in connection with an unlawful referral and/or kickback scheme for medically unnecessary DME.

83.     At all relevant times mentioned herein, Fesler, through Gysaka, directly or through others acting under and pursuant to their direction, instruction, and control, submitted or caused to be submitted the fraudulent prescription and claim forms in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

84.     At all relevant times mentioned herein, Fesler and the No-fault Clinics, acting in concert with each other, participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiffs, in particular, of money.

## **THE MECHANICS OF THE SCHEME TO DEFRAUD**

85.     Beginning in January 2020 and continuing until the present day, Defendants and others not named in the Complaint have engaged in systematic fraudulent billing schemes based upon the alleged provision of DME and/or orthotic devices to Covered Persons.

86.     Fesler incorporated, owned and/or controlled Gysaka for the purpose of defrauding insurers, in general, and Plaintiffs, in particular.

87.     Gysaka, through Fesler, engaged in a scheme to defraud, wherein Fesler: (i) paid kickbacks to the No-fault Clinics in exchange for prescriptions of DME and/or orthotic devices; (ii) obtained prescriptions that were provided pursuant to a predetermined course of treatment, without regard to medical necessity; (iii) obtained and submitted to insurers, in general, and Plaintiffs, in particular, prescriptions which they knew to be intentionally generic in order to misrepresent the number and/or quality of DME and/or orthotic devices actually prescribed; (iv) arranged for the No-fault Clinics to have assignments of benefits and acknowledgement of delivery receipt forms signed by Covered Persons on their behalf to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiffs, in particular; and (v) systematically submitted bills to insurers, in general, and Plaintiffs, in particular, for DME and/or orthotic devices that were purportedly provided to Covered Persons based on medical necessity when, in fact, Fesler, through Gysaka, determined the DME that would be prescribed by the No-fault Clinics, with virtually every Covered Person receiving a substantially similar battery of DME and/or orthotic devices.

88.     With Gysaka in place, Defendants carried out their scheme to fraudulently bill insurers, in general, and Plaintiffs, in particular, for expensive DME and/or orthotic devices that were never provided, or if provided, were provided pursuant to fraudulent prescriptions based

upon a pre-determined treatment protocol, irrespective of medical necessity, and further, were inexpensive items of inferior quality that cost a fraction of the amounts that Defendants materially misrepresented in their fraudulent bill submissions to Plaintiffs.

89.     Regardless of whether a Covered Person was seen by a doctor on the date of the initial office visit at any of the unnamed No-fault Clinics operating in the New York metropolitan area, a Covered Person's initial office consultation would automatically trigger a series of internal practices and procedures in which the No-fault Clinics, in exchange for kickbacks and/or other financial compensation agreements with Gysaka, would issue a prescription for a standard battery of DME and/or orthotic devices, pursuant to a standard protocol or predetermined course of treatment and regardless of whether such items were medically necessary.

90.     Such prescriptions are issued for virtually every Covered Person, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident.

91.     As part of the scheme to defraud described herein, pursuant to kickbacks or other financial compensation agreements with Gysaka, the No-fault Clinics arranged for the fraudulent prescriptions to be issued to Gysaka by: (i) causing their Health Care Practitioners ("HCPs") to write DME prescriptions in accordance with a pre-determined protocol; (ii) ensuring that the prescriptions were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone; and/or (iii) ensuring that the prescriptions were provided directly to Gysaka to ensure that Gysaka could bill Plaintiffs to purportedly fill the prescription rather than allow the possibility that the Covered Person may fill the prescription at a DME retailer of their own choosing.

92.     In numerous instances, not only did Covered Persons receive the same or similar battery of DME and/or orthotic devices, but oftentimes two or more Covered Persons that were purportedly injured in the same accident would receive identical or virtually identical prescriptions for DME and/or orthotic devices despite being different ages, in different physical condition, differently positioned in the same motor vehicle accident, and possessing differing medical needs.

93.     On information and belief, it is improbable that two or more Covered Persons in the same motor vehicle accident would suffer substantially similar injuries, be in similar physical health and/or have similar symptoms that would require identical or virtually identical DME and/or orthotic devices, let alone multiple Covered Persons.

94.     In furtherance of the scheme to defraud alleged herein, pursuant to the fraudulent protocol of treatment, the HCPs at the No-fault Clinics routinely prescribed identical DME and/or orthotic devices to two or more Covered Persons who were involved in the same accident. By way of example and not limitation:

- On or around July 13, 2020, Covered Persons C.G., claim no. 0592793095-02 and K.S., claim no. 0592793095-03 were involved in the same automobile accident, but were in different physical conditions and experienced the impact from different locations in the vehicle, yet received the same DME and/or orthotic devices despite their injuries being almost certainly different:

| Covered Person | Date of Service | DME Billed For | Billing Code | Amount Billed |
|---|---|---|---|---|
| C.G. | 10/9/2020 | 1.Electric Heat Pad | E0215 | $20.93 |
| | | 2.Massager | E1399 | $179.00 |
| | | 3.Lumbar Orthosis | L0627 | $322.98 |
| K.S. | 10/9/2020 | 1. Electric Heat Pad | E0215 | $20.93 |
| | | 2.Massager | E1399 | $179.00 |
| | | 3.Lumbar Orthosis | L0627 | $322.98 |

- On July 19, 2020, Covered Persons A.B., claim no. 0599539920-15 and K.B., claim no. 0599539920-01 were involved in the same automobile accident, but were in different physical conditions and experienced the impact from different locations in the vehicle, yet received the same DME and/or orthotic devices despite their injuries being almost certainly different:

| Covered Person | Date of Service | DME Billed For | Billing Code | Amount Billed |
|---|---|---|---|---|
| A.B. | 8/11/2020 | 1. Dry Pressure Mattress | E0184 | $153.13 |
| | | 2. Cervical Pillow | E0190 | $22.04 |
| | | 3. Bed Board | E0199 | $19.48 |
| | | 4. Electric Heat Pad | E0215 | $20.93 |
| | | 5. Water Circ. Heat Pad w/ Pump | E0217 | $425.00 |
| | | 6. Massager | E1399 | $179.00 |
| | | 7. Lumbar Cushion | E2611 | $282.40 |
| | | 8. Cervical Collar | L0172 | $75.00 |
| | | 9. Lumbar Orthosis | L0627 | $322.98 |
| | | 10. Shoulder Orthosis (2 units) | L3671 | $1,380.46 |
| K.B. | 8/11/2020 | 1. Dry Pressure Mattress | E0184 | $153.13 |
| | | 2. Cervical Pillow | E0190 | $22.04 |
| | | 3. Bed Board | E0199 | $19.48 |
| | | 4. Electric Heat Pad | E0215 | $20.93 |
| | | 5. Water Circ. Heat Pad w/ Pump | E0217 | $425.00 |
| | | 6. Massager | E1399 | $179.00 |
| | | 7. Lumbar Cushion | E2611 | $282.40 |
| | | 8. Cervical Collar | L0172 | $75.00 |
| | | 9. Lumbar Orthosis | L0627 | $322.98 |
| | | 10. Shoulder Orthosis (2 units) | L3671 | $1,380.46 |

- On or around September 17, 2020, Covered Persons A.R., claim no. 0600518443-01, and R.T., claim no. 0600518443-03, were involved in the same automobile accident, but were in different physical conditions and experienced the impact from different locations in the vehicle, yet received the same DME and/or orthotic devices despite their injuries being almost certainly different:

| Covered Person | Date of Service | DME Billed For | Billing Code | Amount Billed |
|---|---|---|---|---|
| A.R. | 9/23/2020 | 1. Dry Pressure Mattress | E0184 | $153.13 |
| | | 2. Cervical Pillow | E1399 | $179.00 |
| | | 3. Bed Board | E0199 | $19.48 |
| | | 4. Cervical Collar | L0172 | $75.00 |
| | | 5. Lumbar Orthosis | L0627 | $322.98 |
| R.T. | 9/23/2020 | 1. Dry Pressure Mattress | E0184 | $153.13 |
| | | 2. Cervical Pillow | E1399 | $179.00 |
| | | 3. Bed Board | E0199 | $19.48 |
| | | 4. Cervical Collar | L0172 | $75.00 |
| | | 5. Lumbar Orthosis | L0627 | $322.98 |

- On February 17, 2020, Covered Persons O.G., claim no. 0580589117-01, and T.M., claim no. 0580589117-02,were involved in the same automobile accident, but were in different physical conditions and experienced the impact from different locations in the vehicle, yet received the same DME and/or orthotic devices despite their injuries being almost certainly different:

| Covered Person | Date of Service | DME Billed For | Billing Code | Amount Billed |
|---|---|---|---|---|
| O.G. | 4/18/2020 | 1. Cervical Traction w/ Pump | E0855 | $502.63 |
| | | 2. Lumbar Sacral Orthosis | L0637 | $844.13 |
| T.M. | 5/29/2020 | 1. Cervical Traction w/ Pump | E0855 | $502.63 |
| | | 2. Lumbar Sacral Orthosis | L0637 | $844.13 |

95.    In furtherance of the predetermined fraudulent protocol of treatment, in numerous instances, the DME and/or orthotic devices prescribed were not documented in the initial examination report or a follow-up examination report of the HCP at the No-fault Clinics where ethe Covered Persons were treated.  To the extent that any of the medical records did identify the DME and/or orthotic devices purportedly prescribed, the records did not explain the medical necessity for the DME and/or orthotic devices, did not identity or reference all of the DME and/or orthotic devices listed on the prescriptions, and in some instances, identified DME and/or orthotic devices that was not included on the prescription issued by the HCPs.  In addition, on many occasions, the prescriptions for DME and/or orthotic devices, the prescriptions purportedly issued by the HCPs were often issued on dates that the Covered Persons did not treat with the HCPs.  By way of example and not limitation:

- On August 10, 2020, Covered Person A.B., claim no.0593358351-02, was seen for an examination at a No-fault Clinic located at 550 Remsen Avenue, Brooklyn NY. The examination report made no mention of any prescription or recommendation for DME and/or orthotic devices. Notwithstanding, Gysaka submitted a bill with a prescription dated August 10, 2020, purportedly from the HCP prescribing the following exact same battery of fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| A.B. | 8/10/2020 | 1.  Egg crate mattress | E0184 | $153.13 |
| | | 2.  Cervical Pillow | E0190 | $22.04 |
| | | 3.  Bed Board | E0199 | $19.48 |
| | | 4.  Heating Pad, Moist | E0215 | $20.93 |
| | | 5.  TENS/EMS Unit | E0730 | $76.25 |
| | | 6.  TENS/EMS Belt | E0731 | $18.00 |
| | | 7.  Lumbar Cushion | E2611 | $282.40 |
| | | 8.  Cervical Collar | L0172 | $75.00 |
| | | 9.  LSO | L0627 | $322.98 |
| | | 10. Knee Orthosis | L1831 | $416.26 |

- On May 26, 2020, Covered Person O.S., claim no. 0587087560-02, was seen for an initial chiropractic examination at a No-fault Clinic located at 360A W Merrick Road, Valley Stream, NY 11580. The initial examination report made no mention of any prescription or recommendation for DME and/or orthotic devices.  Notwithstanding, Gysaka submitted a bill with a prescription dated May 26, 20020, purportedly from the HCP prescribing the following fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| O.S. | 5/26/2020 | 1.  Orthopedic Pillow | E0190 | $22.04 |
| | | 2.  Lumbar Cushion | E2611 | $282.40 |
| | | 3.  Lumbar Support | L0627 | $322.98 |
| | | 4.  Cervical Collar | L0180 | $233.00 |
| | | 5.  Orthopedic Car Seat | E2619 | $46.39 |
| | | 6.  Cold/Hot Pad | A9273 | $15.00 |
| | | 7.  Egg Crate Mattress | E0184 | $153.13 |

- On August 13, 2020, Covered Person O.B., claim no. 0595822957-06, was seen for an initial examination at a No-fault Clinic located at 92-07 Roosevelt Avenue, Jackson Heights. The initial examination report made no mention of any prescription or recommendation for DME and/or orthotic devices.   Notwithstanding, Gysaka submitted a bill with a prescription dated August 13, 2020, purportedly from the HCP prescribing the following fraudulent equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| O.S. | 8/13/2020 | 1.  Orthopedic Pillow | E0190 | $22.04 |
| | | 2.  Lumbar Cushion | E2611 | $282.40 |
| | | 3.  Lumbar Support | L0627 | $322.98 |

96.     In furtherance of the fraudulent protocol of treatment, the specific DME and/or orthotic devices prescribed often contradicted the purported treatment plan of the HCPs.

97.     By way of example and not limitation, several Covered Persons were prescribed DME and/or orthotic devices that were designed to decrease and/or restrict the Covered Persons' mobility such as custom fitted LSO.  At the same time, the HCPs, were also prescribed physical therapy treatments designed to increase the Covered Persons' mobility. Representative claims where Covered Persons were provided with DME and/or orthotic device prescription designed to decrease mobility, while at the same time were actively receiving physical therapy treatments designed to promote mobility include: M.B., 0593537979-01; M.P., 0580485704-01; O.G., 0580589117-01; and O.B., 0595822957-06.

98.     On information and belief, the DME and/or orthotic devices restricting the Covered Persons movement completely contravenes the physical therapy treatments that the Covered Persons were also prescribed.

99.     In furtherance of the scheme to defraud alleged herein, the No-fault Clinics did not provide the Covered Persons directly with the prescriptions for DME and/or orthotic devices. Instead, these prescriptions were given directly to Gysaka to eliminate the possibility that the Covered Person(s) would fill the prescription(s) with a legitimate retailer of DME and/or orthotic devices.

100.     In addition to arranging for fraudulent prescriptions, in exchange for kickbacks and/or other financial compensation agreements with Gysaka, one or more No-fault Clinics operating in the New York metropolitan area often directed their HCPs to prescribe DME and/or orthotic devices that are not included in the Fee Schedule, such as bed boards, cushions, infrared heat lamps, massagers, whirlpools; and ensured that the prescriptions issued were generic and

30

non-descript, omitting any detailed description of the items to be supplied to the Covered Persons.

101.     Similarly, as part of the kickback and/or other financial compensation agreements with the No-fault Clinics, the No-fault Clinics routinely provided Gysaka with generic, non-descript prescriptions for certain Fee Schedule Items, such as back braces, knee braces, shoulder braces, ankle braces, cervical traction units, cervical collars, and lumbar cushions, which Gysaka then used to unilaterally determine the DME provided to Covered Persons in purported fulfillment of the generic prescriptions, in order to bill for the most expensive type of DME and/or orthotic device and maximize reimbursement from insurers, in general, and Plaintiffs, in particular.

102.     By submitting a generic, non-descript prescription, devoid of any detail, in support of their claims for reimbursement, Gysaka was provided the means through which they misrepresented the nature, quality and cost of the DME and/or orthotic devices allegedly prescribed and provided to Covered Persons.

103.     By way of example and not limitation, on information and belief, when an HCP issued a prescription for a "cervical collar," the HCP intended for the Covered Person to receive a basic, inexpensive, circular foam collar, which carries a maximum reimbursement rate of $6.80 under the Fee Schedule, using HCPCS Code L0120, or a basic, prefabricated, two-piece semi-rigid thermoplastic foam collar, which carries a maximum reimbursement rate of $75.00, using HCPCS Code L0172. Instead, Gysaka would often purport to provide a complex, expensive, hard plastic collar with multiple posts and with occipital and mandibular supports, by billing for such items under HCPCS Code L0180, which carries a maximum reimbursement rate of $233.00.

104.     Furthermore, as part of the kickback or other financial compensation agreements with the No-fault Clinics and in furtherance of the scheme to defraud, on their first or second visit to the No-fault Clinic(s), the Covered Persons would be given a number of documents to complete and sign, including, but not limited to, assignment of benefit forms and one or more delivery receipts.

105.     In every instance, in furtherance of the scheme to defraud alleged herein, the delivery receipts describe the DME and/or orthotic devices in the same generic, non-descript manner as the prescriptions, and claim forms submitted by Gysaka in support of its claims for reimbursement.

106.     In furtherance of the scheme to defraud alleged herein, the delivery receipts submitted by Gysaka to Plaintiffs routinely misrepresented the DME and/or orthotic devices provided.

107.     In furtherance of the scheme to defraud alleged herein, Fesler, through Gysaka, purchased inexpensive DME and/or orthotic devices from wholesalers not named as defendants herein that were counterfeit or knockoffs of trademarked items made by other manufacturers. At all relevant times mentioned herein, Gysaka knew that they could purchase the counterfeit items at a fraction of the cost of the actual, trademarked items.

108.     In furtherance of the scheme to defraud alleged herein, Gysaka purchased the cheap DME and/or orthotic devices in bulk and routinely mispresented the nature, quality, and cost of the items in order to fraudulently obtain and maximize their reimbursement far in excess of the amounts they were entitled to receive under the No-fault Law.

109.     In furtherance of the scheme to defraud alleged herein, Gysaka routinely submitted fraudulent documents, including, but not limited to, claim forms, prescriptions, and

delivery receipts, that materially misrepresented the nature, quality, and cost of the DME and/or orthotic devices purportedly provided to Covered Persons.

110.     In furtherance of the scheme to defraud alleged herein, Gysaka routinely submitted fraudulent bills seeking the maximum possible amount of reimbursement under the No-fault Law for expensive DME and/or orthotic devices that were never actually provided or not provided as billed and/or, if provided, provided pursuant to a predetermined course of treatment, without regard to medical necessity.

111.     In many cases, Gysaka never actually provided the DME for which it billed Plaintiffs.

112.     In furtherance of the scheme to defraud alleged herein, Gysaka's bills intentionally omitted the make, model, and manufacturer of the DME and/or orthotic devices purportedly provided to Covered Persons in order to conceal the fact that the DME and/or orthotic devices purportedly provided were inexpensive and of poor quality, to the extent they were provided at all.

113.     By way of example and not limitation, and as set forth in the "Non-Fee Schedule Scheme to Defraud" section below, Fesler, through Gysaka, routinely submitted bills to Plaintiffs for Non-Fee Schedule items wherein Gysaka misrepresented that: (i) certain DME and/or orthotic devices were reimbursable under the relevant Fee Schedule in existence at the time when, in fact, Gysaka were utilizing phantom codes for which there was no published fee schedule; (ii) the charges reflected on Gysaka's bills for Non-Fee Schedule items were the lesser of their acquisition costs or the usual and customary prices charged to the general public; and/or (iii) the Fee Schedule codes and descriptions contained in Gysaka bills corresponded with the equipment purportedly provided.

114.    In addition, as set forth in the "Fee Schedule Scheme to Defraud" section below, Fesler, through Gysaka, routinely submitted fraudulent bills to Plaintiffs (i) in support of expensive custom-fabricated DME and/or orthotic devices, such as shoulder braces that were never provided; (ii) in support of expensive DME and/or orthotic devices that required a customized fitting that they never performed; and/or (iii) which sought reimbursement rates under expensive fee schedule codes for DME and/or orthotic devices that Gysaka never actually provided.

115.    In furtherance of the scheme to defraud and to maximize reimbursement from Plaintiffs, virtually every bill submitted by Gysaka deliberately obscured all identifying information relating to the billed-for DME and/or orthotic devices so as to prevent Plaintiffs from determining the appropriate charges associated with any such DME and/or orthotic device or whether the specific DME and/or orthotic device was medically necessary.

116.    In furtherance of the scheme to defraud alleged herein, Fesler, through Gysaka, routinely submitted fraudulent bills in support of expensive custom fabricated DME and/or orthotic devices, such as shoulder braces that were never provided.  In other instances, Fesler, through Gysaka, routinely submitted fraudulent bills in support of expensive DME and/or orthotic devices that required a custom fitting and/or adjustment which they never performed. By way of example and not limitation, Exhibit "3" in the accompanying Compendium of Exhibits is a spreadsheet containing a representative sample of claims in which Fesler, through Gysaka, billed for expensive custom fabricated DME and/or orthotic devices that were never provided.  In addition, Exhibit "4" in the accompanying Compendium of Exhibits is a representative sample of claims in which Fesler, through Gysaka, billed for expensive supports and/or braces that required fittings and adjustments which they never performed.

117.     Defendants' activity promoted and facilitated other acts that imposed costs onto Plaintiffs well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and peer reviews.

## THE NON-FEE SCHEDULE SCHEME TO DEFRAUD

### 1.     Fraudulent Billing Under Phantom Codes Not Recognized in the Fee Schedule

118.     In furtherance of the scheme to defraud alleged herein, Fesler, through Gysaka, routinely submitted bills for Non-Fee Schedule items, wherein they misrepresented that those items were reimbursable under the Fee Schedule when, in fact, they were utilizing phantom codes for items that were not listed on the relevant Fee Schedule in existence at the time. By way of example and not limitation, Exhibit "5" in the accompanying Compendium of Exhibits is a representative sample of claims in which Gysaka submitted fraudulent bills to one or more Plaintiffs for Non-Fee Schedule items using phantom codes.

119.     By way of example and not limitation Fesler, through Gysaka, routinely submitted bills to Plaintiffs for "Infrared Lamp" units using phantom code E0205, which is not recognized in the Fee Schedule, in the amount of $210.00, notwithstanding that, to the extent any DME was provided, the devices purportedly provided were actually cheap, hand held heat lamps, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is, upon information and belief, no more than $40.00.  Exhibit "6" in the accompanying Compendium of Exhibits is a representative sample of claims wherein Gysaka submitted fraudulent bills for a heat lamp unit to one or more Plaintiffs, using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

120.    By billing under the phantom code for the heat lamp units, Fesler, through Gysaka, billed and were paid in excess of *five times* what they would otherwise have been entitled to receive, if anything, under the No-fault Law.

121.    By way of further example and not limitation, Fesler, through Gysaka, routinely submitted bills to Plaintiffs for "Water circulating hot/cold unit" using phantom code E0217, for $425.00, notwithstanding that, to the extent anything was provided, the water circulating units were cheap aqua relief systems reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $200.00.  Exhibit "7" in the accompanying Compendium of Exhibits is a representative sample of claims wherein Gysaka submitted fraudulent bills for water circulation units using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

122.    By billing under the phantom code for the water pumps, Fesler, through Gysaka, billed and were paid in excess of *two times* more than they would otherwise have been entitled to receive, if anything, under the No-fault Law.

123.    By way of further example and not limitation, Fesler, through Gysaka, routinely submitted bills to Plaintiffs for "Whirlpools," using phantom code E1300 which was not recognized under the relevant Fee Schedule in existence at the time, in the amount of $473.00, notwithstanding that, to the extent anything was provided, the whirlpools are inexpensive "jet spas," for which the usual and customary price charged to the general public is, upon information and belief, no more than $60.00.  Exhibit "8" in the accompanying Compendium of Exhibits is a representative sample of claims wherein Gysaka submitted fraudulent bills for whirlpools to one or more Plaintiffs, using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

124.     By billing under the phantom code for the whirlpools, Fesler through Gysaka, billed and were paid in excess of *seven times* more than they would otherwise have been entitled to receive, if anything, under the No-fault Law.

125.     By submitting to Plaintiffs bills that contained phantom codes not recognized under the relevant Fee Schedule in existence at the time, Fesler, through Gysaka, deliberately misrepresented that their bills reflected either a reimbursement amount set by the Fee Schedule, or alternatively that their bills reflected the lesser of their acquisition cost plus 50%, or the usual and customary price for the public, when in reality, to the extent anything was provided, the items did not have a Fee Schedule code and Fesler, through Gysaka, were entitled to receive only a fraction of the amount reflected in their bills.

126.     Consequently, by submitting to Plaintiffs bills that contained phantom codes not recognized under the relevant Fee Schedule in existence at the time, Fesler, through Gysaka, deliberately and materially misrepresented the amounts that they were entitled to receive and deceived Plaintiffs, among others, into paying many times over what the No-fault Law would have otherwise allowed for medically necessary DME and/or orthotic devices.

**2.     Fraudulent Billing Using Fee Schedule Miscellaneous Codes**

127.     In furtherance of the scheme to defraud alleged herein, Fesler, through Gysaka, routinely submitted bills for Non-Fee Schedule items using Fee Schedule code E1399 which is reserved for miscellaneous items, and in doing so, they fraudulently misrepresented the nature and quality of the billed-for DME and/or orthotic devices and their acquisition costs.

128.     By way of example and not limitation, Fesler, through Gysaka, routinely submitted bills to Plaintiffs for massagers using code E1399, in the amount of $164.00, falsely representing that the amount billed is the lesser of the usual and customary price charged to the general public or Gysaka's acquisition cost plus 50%, when, on information and belief, to the

extent anything was provided, Gysaka provided simple, hand held massagers for which the usual and customary price charged to the general public, upon information and belief, did not exceed $40.00.  Exhibit "9" in the accompanying Compendium of Exhibits is a representative sample of claims in which Gysaka submitted fraudulent bills for massagers to Plaintiffs using Fee Schedule Code E1399.

**3.     Fraudulent Billing of Non-Fee Schedule Items under Fee Schedule Codes**

129.    In furtherance of the scheme to defraud alleged herein, Fesler, through Gysaka, routinely submitted bills to Plaintiffs for Non-Fee Schedule Items using codes reserved for Fee Schedule Items in order to maximize the fraudulent charges they could submit to Plaintiffs, despite the fact that they never provided the billed-for items.  By way of example and not limitation, Fesler, through Gysaka, routinely submitted bills to Plaintiffs for an "Dry Pressure Mattress," a Non-Fee Schedule Item which is nothing more than a thin, foam mattress *pad*, using the Fee Schedule code E0184, which is reserved for a "Foam Rubber Mattress," reimbursable in the maximum amount of $153.13.

130.    Gysaka never provided a dry pressure mattress to any Covered Persons.

131.    To the extent any DME and/or orthotic device was provided, Gysaka provided simple bubble mattress pads, which it described as "Dry Pressure Mattress," for which the usual and customary price charged to the general public, upon information and belief, did not exceed $25.00.

132.    By submitting bills using code E0184, Fesler, through Gysaka, materially misrepresented that they provided Dry Pressure mattresses, when they did not, and also materially misrepresented that the item purportedly provided was a Fee Schedule item, seeking reimbursement in amounts upwards of six times what would otherwise have been a permissible charge for the Non-Fee Schedule item.  Exhibit "10" in the accompanying Compendium of

Exhibits is a representative sample of claims in which Gysaka submitted fraudulent bills for Dry Pressure mattresses to Plaintiffs by billing for the Non-Fee Schedule DME under a Fee Schedule code.

## FEE SCHEDULE SCHEME TO DEFRAUD

1.   **Fraudulent Billing for Custom Fabricated or Custom Fit DME and/or Orthotic Devices.**

133.   The term "custom-made" and/or "custom-fabricated" as used in the New York State Medicaid Fee Schedule refers to any DME, orthopedic footwear, orthotics or prosthetics fabricated solely for a particular person from mainly raw materials that cannot be readily changed to conform to another person's needs. *See, e.g.,* Durable Medical Equipment, Orthotics, Prosthetics and Supplies Policy Guidelines, New York State Department of Health (March 1, 2019), at 4.

134.   Raw materials are used to create custom-made DME, orthopedic footwear, orthotics or prosthetics based on a particular person's measurements, tracings, and patterns. *Id.*

135.   To bill under any Fee Schedule code reserved for custom-made DME and/or orthotic devices, a retailer is required to measure the recipient of the items and fabricate the custom-made item based on those measurements. *Id.*

136.   In furtherance of the scheme to defraud, Fesler, through Gysaka, routinely submitted fraudulent bills in support of expensive custom fabricated DME and/or orthotic devices, despite the fact that, to the extent anything was provided, the DME and/or orthotic devices were cheap, one-size-fits-all items that were not custom fabricated to the Covered Persons' measurements.

137.   In addition to submitting bills for custom fabricated devices that were never provided, Fesler, through Gysaka, routinely submitted fraudulent bills in support of expensive

pre-fabricated DME and/or orthotic devices that required a fitting and adjustment in which the device has been trimmed, bent, molded, assembled, adjusted, modified, or otherwise customized to fit a specific patient by an individual with expertise, which they never provided. *See, e.g.,* Durable Medical Equipment, Orthotics, Prosthetics and Supplies Policy Guidelines, New York State Department of Health (March 1, 2019), at 4; "Durable Medical Equipment, Orthotics, Procedure Codes and Coverage Guidelines," New York State Dep't of Health (August 1, 2019), at 115.

138.    By way of example and not limitation, under the relevant Fee Schedule in existence at the time, the permissible charges for lumbosacral orthoses ("LSOs") range from $43.27, under code L0625 for basic, prefabricated LSOs dispensed off-the-shelf, to $1,150.00 under code L0632 for more complex LSOs that are custom fabricated.

139.    In furtherance of the scheme to defraud, and to ensure they received the maximum reimbursement permitted under the relevant Fee Schedule in existence at the time for LSOs, Fesler, through Gysaka, routinely submitted fraudulent bills for LSOs using codes L0627 and L0637, which are reserved for prefabricated DME and/or orthotic devices that require a customized fitting, notwithstanding that customized fittings were not performed.  Exhibit "11" in the accompanying Compendium of Exhibits is a representative sample of claims where Gysaka submitted fraudulent bills for LSOs to Plaintiffs using codes L0627 and L0637.

140.    To the extent any DME and/or orthotic devices were provided, Fesler, through Gysaka, provided cheap, one-size-fits-all back braces, which were not custom made to the Covered Persons' measurements and for which no customized fitting was ever performed.

141.    Under the relevant Fee Schedule in existence at the time, the permissible charges for knee braces range from $65.00, under code L1830, for a prefabricated knee brace dispensed

off-the-shelf, to $1,107.70, under code L1844, for more complex models that are custom fabricated.

142.     Fesler, through Gysaka, routinely submitted bills for knee braces using codes L1831 and/or L1832, which are reserved for prefabricated DME and/or orthotic devices that require a customized fitting, notwithstanding that customized fittings were not performed. By way of example and not limitation, Exhibit "12" in the accompanying Compendium of Exhibits is a representative sample of claims where Gysaka submitted fraudulent bills for knee braces to Plaintiffs using codes L1831 and/or L1832.

143.     To the extent any DME and/or orthotic devices were provided, Fesler, through Gysaka, provided cheap, one-size-fits-all knee braces, which were not custom made to the Covered Persons' measurements and for which no customized fitting was ever performed.

**2.     Fraudulent Billing for Cervical Traction Equipment**

144.     Gysaka routinely submitted fraudulent bills to Plaintiffs for what it refers to as "cervical traction equipment" under Fee Schedule Code E0855.

145.     The cervical traction equipment purportedly provided by Gysaka are inexpensive replicas or knockoffs of a trademarked cervical traction unit, with a wholesale price that is a fraction of the cost associated with the authentic device. In that regard, to the extent anything was supplied to Covered Persons at all, Gysaka provided basic, inexpensive cervical traction units pursuant to a predetermined course of treatment, based on generic prescriptions, regardless of medical necessity and misrepresented the nature, quality, and cost of the items in each of the bills submitted to Plaintiffs.

146.     By billing for cervical traction units, it purportedly provided under code E0855, Fesler, through Gysaka, falsely represented that they provided expensive, medically necessary

cervical traction units when in actuality they provided cheap, inexpensive items that in many cases were replicas or knockoffs of trademarked items.  By way of example and not limitation, Exhibit "13" in the accompanying Compendium of Exhibits is a representative sample of claims where Gysaka submitted fraudulent bills for "cervical traction equipment" to Plaintiffs.

**3.      Fraudulent Billing for DME and/or Orthotic Devices Not Provided**

147.    In furtherance of the scheme to defraud alleged herein, Fesler, through Gysaka, routinely submitted bills to Plaintiffs for DME and/or orthotic devices that were never provided.

148.    By way of example and not limitation, Fesler, through Gysaka, routinely submitted bills to Plaintiffs for cervical collars under code L0180 in the amount of $233.00, which were not provided as billed, if any were provided at all. By way of example and not limitation, Exhibit "14" in the accompanying Compendium of Exhibits is a representative sample of claims where Gysaka submitted fraudulent bills for cervical collars to Plaintiffs under code L0180.

149.    Under the relevant Fee Schedule in existence at the time, the permissible charges for cervical collars range from $6.80, under code L0120 for basic, flexible, foam collars, to $322.50, under code L0200, for more complex cervical collars with occipital and mandibular supports meant for patients with severe neck injuries.

150.    To the extent any DME and/or orthotic device was provided, Fesler, through Gysaka, provided basic, inexpensive collars, based on generic prescriptions, regardless of medical necessity and misrepresented the nature, quality, and cost of the items in each of the bills submitted to Plaintiffs.  The cervical collars were not complex cervical collars, but rather simple foam and/or semi rigid collars that would otherwise be reimbursable under codes L0120 or L0172.

151.    By billing for cheap, inexpensive foam cervical collars, and/or basic prefabricated two-piece semi-rigid thermoplastic collars under code L0180, Fesler, through Gysaka, falsely represented that they provided complex, medically necessary collars, when they did not.

152.    By way of further example and not limitation, Fesler, through Gysaka, routinely submitted fraudulent bills to Plaintiffs seeking reimbursement for "wheelchair back cushions" using code E2611 in the amount of $282.40, which they did not provide as billed, if anything was provided at all.   Exhibit "15" in the accompanying Compendium of Exhibits is a representative sample of claims where Gysaka submitted fraudulent bills for lumbar cushions to Plaintiffs under codes E2611.

153.    Under the relevant Fee Schedule in existence at the time, code E2611 is reserved for DME satisfying the description of "General Use Wheelchair Back Cushion" and are specifically reserved for support used in connection with a wheelchair.

154.    On information and belief, none of the Covered Persons who purportedly received a lumbar cushion from Gysaka, billed under code E2611, was wheelchair bound.

155.    To the extent any DME and/or orthotic device was provided, the lumbar cushions were not specialized wheelchair cushions, but rather simple back cushions for use in any chair that would otherwise be reimbursable under code E0190 at $22.04.

156.    By billing lumbar cushions under code E2611, Fesler, through Gysaka, falsely represented that they provided specialized wheelchair cushions and/or covers, when they did not.

## DISCOVERY OF THE FRAUD

157.    To induce Plaintiffs to promptly reimburse their claims for DME and/or orthotic devices, Defendants have gone to great lengths to systematically conceal their fraud.  By way of example and not limitation:

- Fesler, through Gysaka, routinely and deliberately failed to submit wholesale invoices with their initial bill submissions, thereby concealing the amounts that Gysaka actually paid for any DME and/or orthotic devices, the manufacturer, make, model, size and quality of the goods, and the actual value of the goods in a legitimate marketplace;

- With respect to Fee Schedule Items, Fesler, through Gysaka, routinely misrepresented in the bills submitted to Plaintiffs that they provided more expensive items from the middle or top end of the Fee Schedule, rather than the inexpensive, basic items that actually were supplied;

- Fesler, through Gysaka, submitted false delivery receipts in support of their bills that purported to demonstrate the Covered Persons' receipt of the DME and/or orthotic devices, when, in actuality, the delivery receipts were routinely blank at the time the Covered Persons signed them;

- Fesler, through Gysaka, systematically failed and/or refused to provide Plaintiffs with a meaningful description of the DME and/or orthotic devices (*i.e.*, make and model) purportedly provided to Covered Persons, and/or additional information necessary to determine whether the charges submitted by Gysaka was legitimate;

- Fesler, through Gysaka, routinely and deliberately submitted claims for reimbursement that were based on a pre-determined protocol of treatment without regard for medical necessity; and/or

- Fesler, through Gysaka, knowingly misrepresented and concealed that Gysaka's claims for reimbursement were based on a pre-determined protocol of treatment without regard for medical necessity and were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement.

158.    Plaintiffs are under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiffs in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent

concealment described above, were designed to, and did cause Plaintiffs to justifiably rely on them. As a proximate result, Plaintiffs have incurred damages of more than $96,000.00 based upon the fraudulent bill submissions.

159.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Plaintiffs, Plaintiffs did not discover and should not have reasonably discovered that their damages were attributable to fraud until shortly before they filed this Complaint.

## FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS FESLER, ABC CORPORATIONS 1 THROUGH 5 AND JOHN DOES 1 THROUGH 5

### (RICO, pursuant to 18 U.S.C. § 1962(c))

160.    The allegations of paragraphs 1 through 159 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

161.    At all times relevant herein, Gysaka was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

162.    From, in or about January 2020 through the date of the filing of this Complaint, Defendants Fesler, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, knowingly conducted and participated in the affairs of the Gysaka enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

163.   At all relevant times mentioned herein, Defendant Fesler, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Gysaka enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs, that were based, in part, on the utilization of fraudulent prescriptions.

164.   On information and belief, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as well as bogus documentation, to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Fesler required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims.

165.   On information and belief, it was both foreseeable and the intended consequence that the of the illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, that the bogus documentation provided by one or more of the John Does 1 through 5, through one or more of the ABC Corporations 1 through 5, generated pursuant to the predetermined course of treatment would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

166.   The racketeering acts set forth herein were carried out on a continued basis for more than a four year period, were related and similar and were committed as part of the ongoing

scheme of Defendants Fesler, one or more of the ABC Corporations 1 through 5 and one or more

of the John Does 1 through 5 to fraudulently bill for DME and/or orthotic devices to defraud

insurers, and, if not stopped, such acts will continue into the future.

167.    This pattern of racketeering activity poses a specific threat of repetition

extending indefinitely into the future, in as much as Gysaka continues to pursue collection on the

fraudulent billing to the present day.

168.    As a part of the pattern of racketeering activity and for the purpose of executing

the scheme and artifice to defraud as described above, Defendant Fesler, with the knowledge and

intent of one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1

through 5, caused mailings to be made through the United States Postal Service in violation of 18

U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud

Plaintiffs and to induce Plaintiffs to issue checks to the Gysaka enterprise based upon materially

false and misleading information.

169.    Through the Gysaka enterprise, Defendant Fesler submitted numerous of

fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly

(but not actually) provided to numerous of Covered Persons as billed. The bills and supporting

documents that were sent by Defendant Fesler, as well as the payments that Plaintiffs made in

response to those bills, were sent through the United States Postal Service. By virtue of those

activities, Defendants Fesler, one or more of the ABC Corporations 1 through 5 and one or more

of the John Does 1 through 5 engaged in a continuous series of predicate acts of mail fraud,

extending from the formation of the Gysaka enterprise through the filing of this Complaint.

170.    A representative sample of predicate acts is set forth in the accompanying

Appendix, which identifies the nature and date of mailings that were made by Defendant Fesler,

in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

171.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

172.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

173.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in its business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $96,000.00, the exact amount to be determined at trial.

174.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Fesler, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**SECOND CLAIM FOR RELIEF**

**AGAINST DEFENDANTS GYSAKAAND FESLER**

**(Common Law Fraud)**

175.    The allegations of paragraphs 1 through 159 are hereby repeated and realleged as though fully set forth herein.

176.    Defendants Gysaka and Fesler made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs for payment.

177.    Each and every bill and supporting documentation submitted by Defendants Gysaka and Fesler to Plaintiffs set forth false and fraudulent amounts for reimbursement for

DME and/or orthotic devices that they purportedly supplied to Covered Persons. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the Covered Persons and the consumer public.

178.    Defendants Gysaka and Fesler intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality, and cost of the DME and/or orthotic devices purportedly supplied to Covered Persons;

- False and misleading statements as to the amounts Gysaka was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the Covered Persons;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to Covered Persons, generically describing the item to conceal the type of item being prescribed; and/or

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a) DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Fesler, through Gysaka, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Fesler, through Gysaka, to manipulate the payment formulas and their

claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

179.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendants Gysaka's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

180.    Defendants Gysaka and Fesler knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

181.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Gysaka and Fesler.

182.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions, and delivery receipts, they would not have paid the Defendant Gysaka's claims for No-fault insurance benefits submitted in connection therewith.

183.    Furthermore, the far-reaching pattern of fraudulent conduct by Defendants Gysaka and Fesler evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed, and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

184.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $96,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages, and other relief the Court deems just.

## THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANTS GYSAKAAND FESLER

## (Unjust Enrichment)

185.     The allegations of paragraphs 1 through 159 are hereby repeated and realleged as though fully set forth herein.

186.     By reason of their wrongdoing, Defendants Gysaka and Fesler have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

187.     Plaintiffs are therefore entitled to restitution from Defendants Gysaka and Fesler in the amount by which they have been unjustly enriched.

188.     By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess $96,000.00, the exact amount to be determined at trial, plus interest, costs, and other relief the Court deems just.

## FOURTH CLAIM FOR RELIEF

## AGAINST THE RETAIL DEFENDANTS

## (Declaratory Judgment under 28 U.S.C. § 2201)

189.     The allegations of paragraphs 1 through 159 are hereby repeated and realleged as though fully set forth herein.

190.      At all relevant times mentioned herein, each and every bill mailed by Fesler, through Gysaka, to Plaintiffs sought reimbursement in excess of the amounts authorized by the No-fault Law and New York State Medicaid Fee Schedule by materially misrepresenting the

DME and/or orthotic devices provided, if provided at all, as well as the cost and quality of the billed for DME and/or orthotic devices.

191.   To the extent the DME and/or orthotic devices were provided at all, each item was a basic, low-quality piece of medical equipment for which Gysaka's wholesale cost was a mere fraction of the amount they charged Plaintiffs and/or was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

192.   At all times relevant herein, the Retail Defendants exploited the No-fault Law and New York State Medicaid Fee Schedule through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular, through the submission of fraudulent billing documents that misrepresented the nature, quality and cost of items that both are and are not listed on the relevant fee schedule purportedly provided to Covered Persons.

193.   In view of the Retail Defendants' submission of fraudulent bills to Plaintiffs, Plaintiffs contend that the Retail Defendants have no right to receive payment for any pending bills they have submitted because:

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs;

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME and/or orthotic devices that they never supplied to Covered Persons; and

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME that, to the extent anything was provided at all, was provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

194.     As the Retail Defendants have knowingly made the foregoing false and fraudulent misrepresentations about the DME and/or orthotic devices purportedly supplied to Covered Persons and the amounts they were entitled to be reimbursed, which they never supplied to Covered Persons, in order to manipulate the payment formulas under the No-fault Law and New York State Medicaid Fee Schedule in their claims submissions and obtain reimbursement far in excess of the maximum permissible charges they were entitled to receive, it is respectfully requested that this Court issue an order declaring that the Retail Defendants are not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims and Plaintiffs, therefore, are under no obligation to pay any of Retail Defendants' No-fault claims.

195.     Plaintiffs have no adequate remedy at law.

196.     The Retail Defendants will continue to bill Plaintiffs for false and fraudulent claims for reimbursement absent a declaration by this Court that Plaintiffs has no obligation to pay the pending, previously-denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs demand judgment as follows:

i)     Compensatory damages in an amount in excess of $96,000.00, the exact amount to be determined at trial, together with prejudgment interest;

ii)     Punitive damages in such amount as the Court deems just;

iii)     Treble damages, costs, and reasonable attorneys' fees on the First Claim for Relief, with prejudgment interest;

iv)      Compensatory and punitive damages on the Second Claim for Relief, with prejudgment interest;

v)      Compensatory damages on the Third Claim for Relief, together with prejudgment interest;

vi)      Declaratory relief on the Fourth Claim for Relief, declaring that Plaintiffs have no obligation to pay any No-fault claims submitted by the Retail Defendants because (1) the Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs about the DME and/or orthotic devices purportedly supplied to Covered Persons and the amounts they were entitled to be reimbursed in order to manipulate the payment formulas under the No-fault Law and New York State Medicaid Fee Schedule in their claims submissions and obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs; (2) the Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs about the DME and/or orthotic devices purportedly supplied to Covered Persons by submitting claims for DME and/or orthotic devices that they never supplied to Covered Persons; and (3) the Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME that was billed pursuant to a predetermined protocol of treatment without regard to medical necessity; and

vii)      Costs, reasonable attorneys' fees, and such other relief that the Court deems just and proper.

Dated:  New York, New York,
        March 13, 2024

                                    Morrison Mahoney LLP

                                    By: */s/ Lee Pinzow*
                                        Robert A. Stern, Esq.
                                        James McKenney, Esq.
                                        Lee Pinzow, Esq.
                                        Sherry N. Glover, Esq.
                                        Attorneys for Plaintiffs
                                        Wall Street Plaza
                                        88 Pine Street, Suite 1900
                                        New York, New York 10005
                                        (212) 825-1212

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY | CIVIL ACTION |
| | 24-CV-1857 |
| Plaintiffs, | COMPLAINT |
| -against- | (TRIAL BY JURY DEMANDED) |
| MAKSYM FESLER, GYSAKA SERVICES INC, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5, | |
| Defendants. | |

# COMPLAINT

MORRISON MAHONEY, LLP
ATTORNEYS FOR PLAINTIFFS
WALL STREET PLAZA
88 PINE STREET, SUITE 1900
NEW YORK, NEW YORK 10005
TELEPHONE: (212) 825-1212